You're on to the first case of the morning. Call it 212-0238. People of the State of Illinois v. Michael Norsworthy On behalf of the Appellant, Mr. R. Christopher White On behalf of the Appellate, Ms. Satterstone Thank you, Mr. White. May I proceed? Good morning. May I please report, Counsel? My name is Chris White. I'm from the Office of the State Appellate Defender representing Michael Norsworthy in this appeal. Initially, I should point out that three issues were initially raised on appeal. The first being whether the evidence presented in the trial was sufficient to support the defendant's conviction for attempted murder. The second, whether the court erred in admitting certain statements. And the third one, whether or not his convictions for aggravated battery with a firearm and aggravated discharge of a firearm should be vacated pursuant to one act, one crime. I should initially note that the defendant conceded error in Issue 2 and the State conceded error in Issue 3, making the latter two issues no longer before the court. And that the sole issue, it seems from our perspective, unless you have other questions, is whether the evidence supported the defendant's conviction. Oh, I'm sorry. Go ahead. Your concession that these statements were admitted and admitted substantively, how does that affect your first argument? I don't think it does. It doesn't because we're still maintaining that the evidence presented at trial, the evidence of the witnesses subject to cross-examination as opposed to some of the statements that were alleged to have been made to certain police officers and other witnesses. That testimony is still so incredible and generally inconsistent as to not support the defendant's conviction. So I don't think the fact that other statements that could have been made by these other witnesses was admitted negatively affects the situation in that way. The jury could have believed those earlier statements and not the in-court statements of those three witnesses, correct? They could have believed those statements, but the statements that were given at trial, I think it's important to know here that the statements that were given at trial are the statements that were made on the road, the statements that were subject to cross-examination, the statements that should be considered to be the most credible as opposed to statements that were alleged to have been made by, I think in this case, police officers. In fact, denied on the stand in many of these cases by those witnesses who said that they either didn't make those statements, didn't remember making those statements because there was a considerable amount of alcohol involved in the events of that evening. So the fact that they were drunk, basically, and they admitted that they had had a lot of alcohol, they didn't remember making the statement. But now they're coming to court some months later, allegedly or hopefully sober, and giving a totally different rendition of the facts. Isn't that an issue for the jury to make a determination which statement they're going to believe, and how do you expect us to reverse the finding and the holding of the jurors based upon credibility? Well, it generally would be because, of course, the standard being any rational trier of fact could have concluded, yeah, should have concluded without a reasonable doubt that the defendant's guilty. But in this case, I think it demonstrates, the facts of this case demonstrate that the jury here was not rational. I think some evidence to support that is the fact that they returned an acquittal where it regarded the events surrounding Tyrone Allen. Because those cases were so interrelated, they happened at the same time, within seconds of one another. The only people that placed a gun in the defendant's hand at trial and said that they had seen the defendant fire is Tyrone, Tyran, and one of the friends of Tyran who drove him there, Lashon. Is it Tyran or Tyran? I believe it's Tyran. I heard from one of the victim family. So it really is Tyran? Could be. There's no shortage of confusion regarding the parties here, so I don't know. Apparently, mom wasn't confused when she named him. But how about weighing the credibility of the witnesses that testified, but also weighing the credibility of the defense witnesses who indicate that it was one of the other guys shooting and that your client was ducking, a big man, ducking while they were shooting at the calves of, I think it was Tyrone. So isn't this really a huge credibility case? And how can you expect us, or what can you point to us to tell us that the jurors were not being rational in concluding what they did? Well, first, I think as far as the truth, the defense testimony or defendant's witness testimony is also subject to the same credibility determinations. But the conviction still has to rest on the evidence presented by the state in the form of the state's witnesses. And looking at the state's witnesses, the fact that you have only Tyrone, Tyrain, nor Tyran, testifying essentially to the sort of the pattern of events that occurred that led up to that shooting. You had various state witnesses testify as far as hearing shots, a melee, bad blood between the parties. I think one good example of the lack of credibility of Tyrain would be the fact that he came in and testified to the fact that despite what I know every other witness said, including Tyrone, that he didn't say anything negative or that could have excited the defendant. You had other witnesses. It was just a greeting. It was his customary greeting that he could not understand why in the world that would possibly be offensive to anyone. When even some of his own witnesses or his own friends said, yes, there's been bad blood. And I believe Melissa English, although it's the defense, adopted sort of the defense counsel's rationale on cross-examination, agreed that those actually would be fighting words, that it wasn't merely a customary greeting. And this was someone who knows Tyran, but I think especially the fact that you have the fact that the jury acquitted Tyrone, acquitted on the shooting of Tyrone, means that they either weren't rational or that they didn't believe Tyrone's version of events. And it's mostly Tyrone's version of events that places the gun in Tyran's hand and then shoot, actually. Tyran was running from the defendant. Tyrone had the gun and Tyrone was running towards the defendant and the defendant was shooting at Tyran and also was shooting at Tyrone. But since Tyrone had a gun and was shooting back, the jury determined that Tyrone was not an appropriate victim such that the indictment against him was returned not guilty. Well, there's some question as to whether Tyrone, whether that came from a struggle for the gun also. But it is Tyrone who suffered the more severe injury. It was Tyrone who, you know, since the defendant turned, pointed the gun directly at his chest and fired, they're hitting him in the chest as opposed to the extremity wound suffered by Tyran. So for them to then say that those were not, they return a not guilty of attempt murder in a situation where it was a point blank shooting right at Tyrone's chest. And then to say that they believed all the testimonies related to the Tyran, I think makes all of that testimony incredible as it relates to Tyrone and Tyran. Because that's really the two witnesses and a little bit from Sean Thompson who said that he saw the gun in the defendant's hand. But even that was a bit equivocal because at first he said it might have been a gun and he didn't know. But other than that, you've really only got Tyrone and Tyran placing the gun in the defendant's hand and shooting. Otherwise, you've got the defendant saying it wasn't him who had the gun. It was Tyrone who had the gun. And he's very believable because he gave three separate different statements, two to the police, one to the court at trial. They were all three totally different statements. The defendant. Yeah, your client, the defendant. Right. And he's saying that he's running away from a man with a gun and shooting at him. He ducks and the bullets miss him and then hit the guy in front of him in the calf. And he's saying that then he turns around after he's running away from the guy with the gun, which makes perfect sense to me. He turns around and accosts the man with the gun, which leads to his, his, him shooting the guy with the gun. The guy with the gun. I mean, I'm just saying, you can look at the other witnesses all you want, but you also have to weigh in your client's testimony and his prior statements. And, you know, is that, we're talking about credibility here. Is he credible? Well, it's not prior testimony. His prior statement is as related to the police officers. Correct. But, but it's still related. It's still the state's burden to prove the defendant guilty. Whether the defendant's believer, whether the defendant's believable or not is, goes into that consideration, of course. But, but the state still has to provide relatively consistent statements of what occurred on that night. And we're going to place the gun in the defendant's hand and cause the defendant to have shot Tyrain. And it's with the intent to kill Tyrain. And, and I think that's where the state failed to do that, despite the inconsistencies in the defendant's statement. And there's explanations for the defendant's inconsistencies. He also had said, you know, he had a good relationship with the Allens, or at least a relationship with the Allens. And you have an unusual situation here where these parties are so interrelated. They've known each other since birth and are dating each other's siblings and all types of things here. So the initial reaction is, well, I'm not going to get these two in trouble, even though they're the ones who, you know, he's maintaining with the aggressor. So that was the initial reaction. And it finds out that the Allens actually had indicated that he had attempted to kill them. His story changes somewhat. So there are some explanations for the changes in his, his statements.  And then going back and saying, oh, having someone testify, he had a ball cap on, and that's why there were no injuries on the face. I mean, all of this is, and you're right. There's, there's some uncredible, incredible people on one side, incredible on the other. Everybody is, nobody are stellar citizens of our county or our state here. There's no question about that. Therefore, it's the job of the juror to weigh the credibility of the witnesses, both the defense and the state, and make a determination who they believe is more credible, whose story they believe, what reasonable inferences they can draw from the testimony that was given. That's where I'm having a struggle with you asking us to reverse this conviction, based upon the fact that you're saying, well, the state still didn't prove their case. Apparently, the jurors felt that they proved their case based upon the testimony that they have heard and their ability to weigh credibility of the witnesses, didn't they? Well, I think that, again, the, the acquittal of Tyrone, I think, goes to show that they didn't believe either Tyrann or Tyrone. I mean, because those were the people, they, they didn't believe that it occurred as Tyrone, Tyrann or Tyrone indicated the wounds to Tyrone were suffered. But they didn't believe that that occurred that way. And that's the story that both Tyrann and Tyrone, and only Tyrann and Tyrone, the two alleged victims here, because no one else was present at the time. It was a very dark October night. That's really the source of all the testimony implicating the defendant in this particular offense, is the testimony of those two people. Aren't they free to believe some of the testimony and not, and free not to believe other testimony, to make that determination? They, they are to an extent. But, again, you've got the situation where this is all so interrelated. The shooting of Tyrone that occurred moments, seconds, sorry, moments after the shooting of Tyrann, you say, well, it occurred in the way that Tyrone and Tyrann indicated it occurred, regarding the shooting of Tyrann. But it didn't occur in the way that the shooting that they indicated that it occurred as to Tyrone. It seems that what the jury may have done here perhaps is maybe split the difference, which is not permissible either. I mean, apparently, if the evidence didn't support the shooting of Tyrone, given the fact that the evidence, the witness statements regarding Tyrone's injuries were the same as those for Tyrann, it's irrational to then suggest that that evidence does not support the shooting of Tyrann, or Tyrann. Thank you. How about your, your argument with respect to the error in admitting the statements? It appears I was incorrect in that those statements were admitted substantively and therefore could have been used for impeachment purposes. So I did not proceed on that argument for purposes of the refinery forward. Let me ask you one other question. You relied on the case of people versus Henry with respect to the intent to kill and the reasonable doubt. Isn't Henry a distinguishable from this case? In the sense that Henry was a better shot, I guess, is the way to put it. In that sense, it may be. But I think it's consistent and on point with respect to the other aspects of it. It's shooting into, it's shooting after a confrontation or a fight, a vocal melee here. It was shooting towards, towards the defendant, but not necessarily at the defendant. In fact, I think it's a little better here because, in this particular case, because by everybody's testimony, it was extremely dark out there. And that's part of the problem. There was no lighting. So to say that the defendant manifested an intent to kill because he shot towards the defendant, which I believe is really even the testimony we have of all of the witnesses. It's not that he was within, you know, a couple of feet and could see him. So if you're a bad shot, you don't have any intent to kill? Well, not necessarily bad. I think the fact that he, the circumstances of this case, because it was so dark, because you've got all of these other things going on, it goes to minimize the fact or diminish the fact that there was this specific intent for him to kill. It sounds more from the evidence than even Tyran and Tyrone's statements, or actually not Tyrone's statements, who says he turned and actually fired at him and saw him and was close. In Tyran's, it's shooting in the direction of him. He happens to hit extremities, so he may or may not have been a bad shot. That's true. But I think it's not inconsistent with Henry in that regard. Didn't Tyrone testify that the defendant yelled that he was going to kill both of them? Tyrone did, but again, it was only Tyrone. Tyrone's the only one that we get any type of intent evidence, any type of gun in the defendant's hand and shooting evidence at trial, as far as the trial testimony was concerned. Could the jury determine that was merely a salutation? A greeting. A greeting like Tyrone's, perhaps. Didn't Tyrone, when he said he wouldn't play cards with the mother-effing bitch, wouldn't the fact that he said he wasn't going to play cards with him indicate that it really wasn't a salutation? Whereas if he had said, I am going to play cards with that mother-effing bitch, that would have been probably a greater indication that it was a salutation. Indeed. If he started with hello, I would like to play cards with. Yes. In fact, he was called, I believe, come play cards with the defendants here. You might want to come play cards. So, yes. So because we regard the evidence as not sufficient to support his conviction, we ask that you reverse. Thank you, counsel. Ms. Swiss, you may proceed. Good morning, Your Honors. Counsel. May it please the court. Cayla Swiss for the state. I just want to take on right away the difference of the acquittal for Tyrone and, of course, the conviction here for Tyrone, because counsel makes the argument that how can they both believe and not believe. But first of all, there are different facts here. This isn't a case of legal inconsistency, which even if that were, obviously we no longer reverse on those grounds. But it's not a case of that. You know, they can believe some of what they hear, not believe others. And more importantly, the point I want to make is that this could just be jury lenity, something which they don't, you know, they're not following the law, but maybe they saw that there was some provocation here certainly in the words that most of the witnesses said Tyrone uttered, and maybe even in the sense that Tyrone invited Tyrene to the party knowing the defendant was there, maybe trying to instigate things. They may have, you know, determined that there was some provocation here or some bad behavior or less than innocent behavior on the part of the twins, in which case they decided they didn't want to slap this defendant with two similar convictions, or two victim's convictions, and so they didn't. I don't think it can be taken any further than that. The safeguard for the defendant in any type of jury lenity is, of course, to look under the normal standard of, you know, the light most favorable to the state and determine whether the facts were sufficient. In this case, there are really three pieces. There's, first of all, the recorded statements. The only three people to say they saw a defendant shooting were LaShonda Green, LaShonda Williams, and Shatera Crider. But all three of those statements were substantively admitted. They are given the exact same weight as their testimony at trial in terms of just, you know, they're admitted substantively and can be considered by the jurors. So it's up for them to determine when they were lying, if, in fact, there's an inconsistency. Now, certainly with Green and Crider, there is an inconsistency. But Green, if anything, looking at and trying to determine why they might give more credibility to her first statement, she says that in her first statement she said the shots came from defendant for sure, for sure. She said it twice. Now, at trial, she takes a stand and she says, I didn't say that to the police officer. I was drunk, but I recall what I said, and I didn't say that. Yet we have her recording, the police recording, where she says exactly that. And so, if anything, it shows that she is lying at trial or she clearly, you know, may have been intoxicated, but her memory at this point is very poor because she did say that. And for her to stand and deny that is something that's a clear showing to the jurors that they can't believe her at trial. So is it the jurors' responsibility to determine whether she was lying at trial or lying to the police? Oh, absolutely. It's absolutely a credibility question. Williams, who said in the statement to police that defendant had shot four times, takes a lot of that back. But she still says, I saw defendant with the gun inside the house, maybe outside the house, and I may have seen the shot. So she takes it back. She equivocates, but she doesn't take it back totally. And Crider, of course, says, I didn't see it now, even though before she had said that she saw a long-barreled gun. Defendant was holding it. He was waving it around. He shot four or five times. Now suddenly she says, I only saw a silhouette, and I'm not sure who had it. So they do take back their statements at trial, but they have very convincing statements right after this occurred. And it's for the jurors to determine which of those to believe, whether, you know, they were telling the truth maybe right away. And now there's that code of silence that the defendant invokes several times about how people on the street don't want to get in trouble and so they don't want to take a stand against somebody else where they might, you know, end up in trouble with that person. So we have those statements. But secondly, we have people who didn't see the shooting or say they didn't see the shooting, but they still put defendant with the gun. Now, the only person who puts Tyrone with the gun, or Tyrone or Tyraine, but he puts Tyrone with the gun, is defendant. On the other side, we have not only Tyraine and Tyrone who say, no, defendant had the gun, but we have other people. We have Williams who still says, I saw a gun, and it was in defendant's hand. Nobody says, other than defendant, nobody says they saw Tyrone with a gun. We also have LaShawn Thompson, who was not all that equivocal if you read his whole statement, even though in their brief the defendant said it was very equivocal language, that he said something about, I think I saw something like a gun, a kind of gun. But he says those words, and it may be that he's just a little less than eloquent because he then goes on and says, defendant was waving the gun and yelling something. And he also says, I froze and waited to get away to safety, something which certainly backs up the fact that he believed that defendant had the gun. And then, of course, we have Williams who still says she saw defendant with the gun. So the vast majority of witnesses do see, or not the vast majority, but a fairly large number of people see defendant at least with the gun. Nobody but defendant says Tyrone had a gun. On the other hand, we have defendant's account, several accounts. And the first account is his false exculpatory statement to police. Obviously, that's a consciousness of guilt. He gives an alibi. He also, at that point, says he doesn't. Could I stop you on that? Please explain how an exculpatory statement is consciousness of guilt. He gives a false statement to begin with that says that he was there all night and three people came and vouched for him. And he was never at the scene. He describes the car left behind his car at the scene. Would you say it was a feeble attempt at an exculpatory statement? Well, yes. An alleged exculpatory statement. Right. He gave an exculpatory statement, which later he admitted was false. Yes. But he also. Was there evidence that Tyrone was shot during a struggle? There is evidence that Tyrone may have been shot during a struggle by two different accounts. The defendant says that he turned and struggled with Tyrone for the gun. Tyrone says that after being shot, he and Lee Dockery, who I believe was his cousin, both tackled defendant. And there was a struggle. And then Lee Dockery got the gun, threw it into the field. And at that point, defendant ran off. So that was after Tyrone was shot. That was after. Yes. That's his account. Yes. But we have a defendant making that first statement saying he doesn't want to record it. He makes a second statement. Again, argues he doesn't want to record it. Oh, and in the first statement, even at trial, he is still lying. And it's clear he's lying because he says he never signed the statement. It was signed with an X. And he says, I never got my Miranda rights. I didn't sign it. I didn't sign the Miranda warnings. There's a DVD shown where he is shown signing, in fact, that Miranda rights. His second statement is incredible, at the very least, and it's rebutted by physical evidence. And that's important. By defendant's account, he was chasing Tyrone, then his defendant, and then Tyrone. Well, he shot anywhere from four to seven times, depending on which of the witnesses you listen to, but certainly not more than seven times. Most of them said four or five times. And he hit not the defendant, who was his target and who was right in front of him, but somebody who was directly in front of him at a distance, and somehow managed to hit him out of five, six times, managed to hit him three times. That's frankly incredible that he missed the target in front of him and hit somebody else three times. You know, if that happened once, you might say it could happen. But three times, it makes it very unbelievable. And on top of that, we have other things. We have a defendant's argument that Tyrone had the gun and pistol-whipped him around the face. And then he also, Tyrone hit him in the face around his face with a bottle. And Tyrone also, and I think maybe Tyrone also, according to defendant, struck him in the face with their fists. And yet the officers at trial say we saw him at booking, we saw him in the interview, we saw him when we first picked him up. He didn't have any visible injuries. He never complained about any injuries, never asked for any medication. And then suddenly after that testimony, defendant now says, oh, it wasn't around my face. It was around my head, you know, between my hair and that type of thing. That's why it wasn't visible. Again, changing the story to meet the facts, but not in a way that's credible at all. And then finally, in terms of the intent to kill, we have a person shooting, like I say, between four and seven times and managing to hit somebody three of those times. He's certainly trying, even after hitting somebody once, he's shooting again and again. So the sheer number of shots, the sheer amount of times he hits him, the fact that, yeah, he isn't expected to be an expert marksmanship, if anything it's pretty good that he hit him that many times would be my argument. And we do have Tyrone hearing a threat. And yes, it's Tyrone, and he's related to Tyraine, and of course he was one of the victims. But nevertheless, there is a statement of a threat to kill both Tyraine and Tyrone. And when you're running, and all these people were running by all accounts, to be able to shoot in that direction and hit him at all, I don't think it's necessarily something that we can infer that he was attempting to only shoot him outside of the abdominal or outside of the main part of his body in order not to kill him. So I do believe there is sufficient proof of the intent to kill. And Henry is definitely a case which is not at all on all fours in terms of the facts, because that was a case in which there was a very slow-moving car. There was some showing that he was very fearful, didn't maybe know who he was dealing with. And I think the main fact is the fact that he was an expert marksmanship was very close. And if he had wanted to do something and harm them, he would have. Whereas here, if I recall to Henry, I don't believe he hit anyone. Here we have somebody who we don't know what his skills are, and certainly he did a good job at hitting the victim. You indicated that you thought that we have permanent conviction for attempted murder, but some other target should be dismissed under one act, one crime. Yes. Should we remand it for a new sentencing here? No, I don't believe that's necessary. It seems that in terms of the – I don't see how that would necessarily have any impact on the other sentences. He received the absolute minimum sentence. He received 25 years plus six on the attempted murder, so yes, it was. Yes, I do think it was six years, so that would be the minimum sentence on the other. So for that reason, we would ask this court to affirm defendant's conviction and sentence. Thank you, counsel. Mr. White, for a motto argument? I just had a couple of very brief statements. Sure, let me ask you a question first. If you could respond to counsel's argument that what if the acquittal for Tyrone's shooting was the result of jury lenity or perhaps jury nullification? I don't think that argument is particularly good in this situation because they – if that were true, I think the jury would return the verdict on the wrong counts because it's Tyrone who was the one who was the provocateur apparently, according to everyone except Tyrone, and it was Tyrone who was more seriously injured. So I think if they were going to do jury lenity, it would be on the less seriously injured person of the – they would convict on the person who was less culpable and more seriously injured. So it doesn't seem to be consistent with how the jury would behave in sustaining the conviction of the person who was less injured and who was in some part responsible or arguably responsible. If there's sufficient evidence to convict under the Callan standard, are we really – I mean, are we really supposed to look at what the jury did on other counts, just other victims? Again, I know you're arguing there isn't sufficient evidence. I understand that. But if we find that there was sufficient evidence under that very deferential standard, are we really supposed to be looking at what happened on other counts? Well, generally, no. I think in this case it's instructive because it shows that because both of these convictions were based – related to one of these brothers, a very similar situation happened very quickly in time to one another, very close in time to one another, that I think it's indicative to show that the jury could not have believed these cases because – or could not have believed the testimony of Tyrone and Tyrant because of the fact that it returned a not guilty verdict, assuming there was that jury notification, which it's not permitted to do. I think it only leaves you with the choice that they're either not rational, the jury, in returning a verdict on one and not the other in this type of situation, or that they didn't actually believe the testimony of Tyrone and Tyrant. And some of the other witnesses, counsel points out, Crider, for example, who said at the time that she for sure saw the defendant. Well, the problem, too, with a lot of these witness statements is no one was really there. At the time of the shooting, the three people were sort of running this parade all the way out towards this church, which was located down the street on this dark October evening. So there's no – these people weren't actually there to see the party shoot or to tell who was doing the shooting. So it makes as much sense that when they sober up, they realize they did not actually see what they thought they saw and testify more truthfully and subject to cross-examination. Wasn't the defendant in the middle in this parade? The defendant was, yes. Tyrone in front of him and Tyrone in back of him. Besides the difference in the spelling of their names, one was running away from the defendant and the other was running towards the defendant. Right. So the provocateur was the party who was attempting to withdraw, and Tyrone was either running backwards or he was running in the same direction, and it would appear as if he was trying to overtake and do harm or do something to the defendant. Do you see a difference between the two in the sense that Tyrone is withdrawing from the event and Tyrone is not? If Tyrone were withdrawing, he would be running in the other direction or at least something oblique to the direction that they were running? Right, and that's the testimony of the three, Tyrone, Tyraine, and the defendant for that matter. But again, I don't think these witnesses saw that. By the time these witnesses got outside, they wouldn't have been able to measure the angle of it. Well, it was according to one of these witnesses, I think it might have even been Shrita Kreider, Shatira Kreider, it was very dark, but there was nothing that could be seen. It was an open lot. Did the record reflect what the caliber of the gun was by any chance? I don't recall it saying no. And it was probably a pistol? It was a pistol, yes. Not a revolver? And it was not recovered at the time, at least at the time of the preparation of the record. It wasn't introduced into evidence. They were basing it on the bullet wounds themselves. Brief question. Can a false exculpatory statement allow for an inference of consciousness of guilt as the prosecution suggests? Well, it can. I mean, it's always one of the things that the jury can consider and apparently did consider here. But it's still, I think, the ultimate thing here, he was able to explain, or he did explain, the reasons for giving those false statements. And the problem you still have, I think, is that the state's witnesses don't support the guilt. It's the state witnesses that the state put on that evidence in order to support the defendant's guilt. And it's, I think, that witness testimony that falls far short of proving the defendant's guilt of attempted murder. If we affirm the conviction, you didn't ask for a remand for resentencing based on the state's sentencing concession error, did you? Based on what Angoran Crime noted. You don't see that as necessary? In this situation, it probably would not be, although there may be some benefit to the court knowing that the other charges were not upheld or were not, were not upheld. There was a finding that a firearm was personally discharged, correct? There was, yes. So, I mean, he got the 6 and he got the 25. Correct. There was injury. I mean, sending it back for the court to know that really, the court can't do anything better for him, can it? Probably not. Okay. I'd like to thank the attorneys for their arguments. The case will be taken under advisement. We'll take a short recess.